Memorandum of decision on a petition filed by the Commissioner of the Department of Children and Families to terminate the parental rights of the respondent mother, Myrna R, and the biological father, John Doe, with respect to the minor child, Keysha.
The Petition is granted
 MEMORANDUM OF DECISION
On July 2, 1999, the Department of Children and Families (D.C.F.) filed a petition alleging that Keysha, whose date of birth is February 1999, was neglected in that (1) she was being denied proper care and attention physically, educationally, emotionally, or morally and (2) she was being permitted to live under conditions, circumstances, or associations injurious to her well-being. The Department also alleged that Keysha was uncared for in that (1) she was homeless and (2) her home could not provide the specialized care which her physical, emotional, or mental condition required. A concomitant Order of Temporary Custody (O.T.C.) was applied for and granted by the court (Cohn, J.). The allegation was that Keysha was in immediate physical danger from her surroundings. On July 9, 1999, an agreement on the O.T.C. was reached and approved by the court (Cohn, J.) That agreement was that the O.T.C. would remain in effect until the respondent mother entered into Crossroads/Amethyst House, an in-patient substance abuse program. In addition, on July 9, 1999, Ms. R entered a nolo contendere plea to the allegation of neglect. There was no plea from the father because the father of Keysha was listed as unknown. A six (6) month period of protective supervision was ordered, to commence CT Page 2800 when Ms. R entered Crossroads/Amethyst House. Also, on July 9, 1999, Ms. R agreed to Specific Steps. Ms. R entered Crossroads/Amethyst House on July 16, 1999, triggering the start of the six (6) month period of protective supervision. On December 7, 1999, the protective supervision was extended for six (6) months to July 16, 2000 (Cohn, J.). On December 7, 1999, Ms. R was unsuccessfully discharged from Crossroads/Amethyst House and did not have adequate housing. Based on this D.C.F., on December 10, 1999, applied for a second O.T.C. alleging that Keysha was in immediate danger from her physical surroundings. This O.T.C. was granted by the court (Dewey, J.) and confirmed by default on December 17, 1999 (Dewey, J.). On March 20, 2000, the original disposition of protective supervision was modified to commitment to D.C.F. (Gallagher, J.). The commitment commenced March 20, 2000, and ran to March 20, 2001. On January 8, 2001, the permanency plan proposed by D.C.F. of termination of parental rights was approved by this court and a finding that reunification efforts with Ms. R in were no longer appropriate was also made. In addition, on January 8, 2001, an extension of the commitment to March 20, 2002, was granted by this court.
On February 7, 2001, D.C.F. Filed a petition seeking to terminate the parental rights of Ms R. Ms. R was served with the petition in hand and service was confirmed by the court (Conway, J.) on March 8, 2001. The sole ground alleged by D.C.F. was that Keysha had been found in a prior proceeding to have been neglected or uncared for and Ms. R had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the Keysha, she could resume a responsible position in the life of Keysha. A T.P.R. petition was also filed on the same day seeking to terminate the parental rights of Rafael Cintron Ortiz, Ms. R's husband on the date of Keysha's birth, alleging abandonment, failure to rehabilitate and no on-going parent-child relationship. However, a paternity test excluded Mr. Ortiz as Keysha's father, and on June 7, 2001, the petition against Mr. Ortiz was dismissed (Conway, J.). Because no other father has been named by Ms. R nor has any other man come forward claiming to be the father of Keysha, D.C.F. is also seeking to terminate the parental rights of John Doe alleging abandonment, failure to rehabilitate and no on-going parent-child relationship. Notice to John Doe was effectuated by publication of notice on February 22, 2001, in the New Haven Register, a newspaper of general circulation in the New Haven area. This service was confirmed by the court (Conway, J.) on June 21, 2001. On September 5, 2001, D.C.F. filed a motion to amend the T.P.R. petition, seeking to include additional or changed facts and circumstances, concerning Ms. R. This motion was granted by this court on September 10, 2001.
This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court. CT Page 2801
The respondent mother, Myrna R is opposing the termination of her parental rights and has been represented throughout this entire proceeding by counsel. Keysha is also represented by counsel.
The termination of parental rights hearing commenced on September 5, 2001, resumed on December 10, 2001, and concluded on January 28, 2002. Closing arguments were made on February 5, 2002.
 ADJUDICATORY FINDINGS
The hearing on a petition to terminate parental rights is comprised of two parts.
In the adjudicatory phase the trial court must determine whether any of the statutory grounds alleged by D.C.F. exist by clear and convincing evidence. In the adjudicatory phase the court is limited to considering events preceding the filing of the termination petition or the latest amendment. If a determination is made that one or more of the statutory grounds exists, the court then proceeds to the dispositional phase. In this phase the court determines whether the termination of parental rights is in the best interest of the child. In making this determination the trial court can consider all events occurring prior to the date(s) of the dispositional hearing including those occurring after the filing of the petition.
The sole ground alleged by D.C.F. concerning Ms. R is that she is the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding and has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. This ground tracks the language contained in Conn. General Section 17a-112 (j)(3)(B).
In order to terminate the parental rights of Ms. R D.C.F. must initially show by clear and convincing evidence that it has made reasonable efforts to locate her and to reunify the child with the her, unless the court finds in this proceeding that the she is unwilling or unable to benefit from these reunification efforts.
The record, by clear and convincing evidence, establishes the following:
Except for a period of time in late 1999, and early 2000, the location of Ms. R has never been an issue and her whereabouts have always been known. CT Page 2802
Reasonable efforts to reunify Keysha with her mother were deemed no longer appropriate on January 8, 2001.
Prior to Keysha's birth, Ms. R was attending the APT Foundation in New Haven where she received substance abuse treatment and methadone. Ms. R entered the APT program abusing heroin and cocaine. When she started at the APT foundation in 1999, she informed the program that she had a three (3) year history of heroin use (Petitioner's Exhibit B). Keysha was born on February 3, 1999. She was born addicted to heroin and methadone and also tested positive for cocaine and Hepatitis C. Keysha was hospitalized for thirty-six (36) days until March 11, 1999, because she was going through neo-natal abstinence. Following Keysha's birth, D.C.F. became involved with Ms. R. On March 12, 1999, Ms. R entered into a service agreement with D.C.F. (Petitioner's Exhibit F.) wherein she agreed to participate, comply and successfully complete the Families in Recovery Program (F.I.R.P.)/Liberation House Program (a in-patient program for women with young children). The purpose of this agreement was "to keep your child safe)" (Petitioner's Exhibit F at page 1).
Following the initiation of court involvement it was the intent of D.C.F. to reunify Keysha with her mother. On July 9, 1999, in order to achieve this reunification, Specific Steps were agreed to by Ms. R (Petitioner's Exhibit H) and approved by the court (Cohn, J.). D.C.F. made multiple referrals to various programs to address Ms. R's various problems. Among the programs that Ms. R was referred to are following: F.I.R.P./Liberation House, Crossroads/Amethyst House, Multicultural Ambulatory Addictive Services (M.A.A.S.), Advanced Behavioral Health (A.B.H.), Central Treatment Unit (C.T.U.), Connecticut Valley Hospital (C.V.H.) and the APT Foundation. All of these programs were offered to help Ms. R with her substance abuse problem. In addition, Ms. R was referred to the Connecticut Mental Health Center (C.M.H.C.) Hispanic Clinic for parenting classes and the Connecticut Incorporated Supportive Housing for Recovering Families for housing services. Ms. R was discharged from F.I.R.P./Liberation House, Crossroads/Amethyst House, APT, and M.A.A.S. for non-compliance; did not act on the referrals to A.B.H. and C.T.U.; attended only three (3) sessions of the C.M.H.C. parenting program and has failed to take advantage of any of the programs offered to her to obtain housing or to address any of her other problems.
Therefore, the court finds that D.C.F. has proven by clear and convincing evidence that it has made reasonable efforts to locate Ms. R and it has made reasonable efforts to reunify Keysha with Ms. R who is unable or unwilling to benefit from reunification services. CT Page 2803
Statutory grounds exist to terminate parental rights when "[the parent] of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . ." C.G.S. Section 17a-112 (j)(3)(B)." In analyzing a respondent parent's rehabilitative status the court must look at the status as it relates to the particular child, and such rehabilitation must be foreseeable within a reasonable time." (Citations omitted) In re RoshawnR., 51 Conn. App. 44, 54-55 (1998).
On November 12, 1998, approximately three months prior to the birth of Keysha, Ms. R sought help from the APT Foundation to address a heroin problem that had been ongoing for three (3) years. Her cooperation with APT was marked initially by an unwillingness to participate in the program. This behavior generated a letter of bad standing dated December 11, 1998, (Petitioner's Exhibit E). Ms. R then became more compliant with the program as the birth of the baby neared. She was also started on methadone. While receiving treatment from the APT Foundation Ms. R continued to abuse cocaine until February 22, 1999, or February 23, 1999. In conjunction with the service agreement (Petitioner's Exhibit E), Ms. R agreed to enter the F.I.R.P./Liberation House program to address her substance problem. Peggy Whalen, a licensed alcohol and drug abuse counselor and declared an expert in drug and alcohol counseling, testified that Ms. R did well in the APT program and was successfully discharged. However, Ms. Whalen testified that Ms. R also had temporary housing and was unemployed. She also had a general lack of social support. Ms. Whalen specifically stated that Ms. R "need[ed] in-patient treatment to support her, you know, staying drug-free. And due to the lack of social support, I also felt that would be helpful to her, and offered to her at an in-patient facility — a long term in-patient facility." (Testimony of Peggy Whalen at page 28). Ms. Whalen also felt that going into an in-patient program with her child would provide motivation for Ms. R to abstain from using illegal substances.
On March 12, 1999, pursuant to the service agreement entered into between Ms. R and D.C.F. (Petitioner's Exhibit F), Ms. R and Keysha entered F.I.R.P./Liberation House. This program is an inpatient facility designed so that mothers who have a substance abuse problem can get treatment for their problem in a residential setting while living at the facility with their children. On May 11, 1999, Ms. R left this program prior to completing it because of problems she was having with the staff and obeying house rules. She left despite knowing that if she left the program with Keysha that D.C.F. would look to remove Keysha from her. On May 13, 1999, after D.C.F. intervention on her behalf, Ms. R was allowed CT Page 2804 to re-enter to the program. She admitted relapsing while out of the program. A behavioral contract was put into place to assure her compliance. Despite this contract, on June 28, 1999, Ms. R left F.I.R.P./Liberation House with Keysha despite having no money, supplies or a place to go. She returned with Keysha on June 29, 1999, and was discharged from the program. The reason for the discharge, according to the Affidavit in support of the O.T.C. submitted by D.C.F. Social Worker Karen Katrey was the Ms. R broke every house rule in the preceding twenty-four (24) hours. This behavior, and the fact that Ms. R had no resources to care of Keysha (no financial resources, no home or any plan to care for herself and Keysha) prompted D.C.F. invoking a ninety-six (96) hour hold and later seeking, and obtaining, an O.T.C.
Pursuant to the agreement reached between D.C.F. and Ms. R the O.T.C. was vacated and a nolo contendere plea was entered on the underlying allegation of neglect. Specific Steps were also entered. Ms. R and Keysha were re-united and a six (6) month period of protective supervision commenced when Ms. R entered Crossroads/Amethyst House on July 16, 1999. Keysha was reunited with her on August 6, 1999. Crossroads/Amethyst House is similar to F.I.R.P./Liberation House in that it is a residential facility where women reside with their children while receiving substance abuse treatment. She was unsuccessfully discharged for non-compliance with the program on December 7, 1999. Ms. R's stay at the program was marked by dirty urines indicating the ingestion of opiates, threatening remarks directed at staff and other residents, and uninvited physical contact with another resident. Because Crossroads/Amethyst House is a program for women with young children there is a low level of tolerance for anger, shouting, threats and generally disruptive behavior. Her anger was so extreme that Ms. R was referred to Elm City Counseling, for anger management counseling. Ms. R attended three (3) sessions at Elm City Counseling but was discharged for missing three (3) sessions in a row. Ms. R was aware that an unsuccessful stay at Crossroads/Amethyst House would lead to a report to D.C.F. which would, in turn, lead to Keysha being removed from her. Despite this consequence and the program's attempt to address Ms. R's behavior to the maximum possible level before deciding to terminate her from the program. Ms. R was terminated for non-compliance. This termination resulted in D.C.F. invoking a second ninety-six (96) hour hold and later seeking, and obtaining, a second O.T.C., as well as Keysha being committed to D.C.F.
Ms. R whereabouts was unknown from December 29, 1999, to March 24, 2000. In April of 2000, Ms. R told Eric Hundley, the D.C.F. social worker assigned to this case from June 25, 1999, to August 11, 2000, that she was still abusing substances. Ms. R failed to comply with Mr. Hundley's referral to A.B.H. and A.B.H.'s referrals to C.T.U. to address her substance abuse problems. Instead, she detoxed at the Cedar Street CT Page 2805 program and from there went to Horizons, an inpatient substance abuse program. She entered this program on May 15, 2000, and left to undergo surgery approximately one week later. While recuperating from surgery Ms. R abused substances and had to be detoxed at Bridgeport Hospital before re-entering Horizons on June 17, 2000. Ms. R completed the Horizon Program on July 3, 2000, and was referred by that program to the Substance Abuse Treatment Unit (S.A.T.U.) for follow-up treatment. She was at S.A.T.U. for brief period of time. In the summer of 2000, Ms. R admitted to Eric Hundley she was abusing drugs and alcohol. Ms. R was then referred to the M.A.A.S., an out-patient substance abuse treatment center for further substance abuse treatment. Ms. R missed three intake appointments at M.A.A.S. but eventually entered the program on November 28, 2000. These missed appointments resulted in D.C.F. changing Ms. R's visitation with Keysha from unsupervised visits to supervised visits. At the time of her entry into the M.A.A.S. program she was abusing cocaine and opiates (she tested positive for cocaine and opiates on October 30, 2000, and positive for opiates on November 27, 2000). She was characterized by Barry Panich, a drug counselor at M.A.A.S. as a "difficult client" who had "outbursts" during treatment, at one time threatening another client. She also had positive urines while at M.A.A.S. (positive for cocaine on December 12, 2000, December 18, 2000, and March 9, 2001; positive for opiates on December 1, 2000, December 12, 2000, December 18, 2000, December 28, 2000, January 5, 2001, and March 9, 2001). Ms. R was discharged in February 2001, for threatening another client, re-admitted and put on a strict contract, had a positive urine, given a second chance and finally discharged from the program on May 8, 2001, for leaving treatment early without permission. When she was discharged M.A.A.S. recommended in-patient treatment.
On January 8, 2001, this court made a finding that reasonable efforts to reunify Keysha and Ms. R were no longer appropriate. Despite this finding, Paulette Limato the D.C.F. social worker assigned to Ms. R from mid-March 2001, to the end of November, 2001, offered to assist Ms. R to find an in-patient substance abuse program in accordance with the recommendation of M.A.A.S. Ms. R was offered a residential bed at either (C.V.H.) or F.I.R.P/Liberation House. She refused to enter either program because Ms. R felt that she did not need in-patient help, did not have a drug problem and was tired of going to groups. Nevertheless, D.C.F. continued to provide visitation and also gave bus passes to Ms. R to assist her to attend Narcotics Anonymous (N.A.) meetings that she claimed she was attending, although no confirmation has been received by D.C.F. that she has been attending these meetings.
On May 31, 2001, pursuant to a court order (Conway, J.), Dr. Nancy Randall, a licensed psychologist, performed an assessment of Ms. R as well as an interactional study between Ms. R and Keysha and prepared a CT Page 2806 report of her observations (Petitioner's Exhibit N). Ms. R appeared for this evaluation an hour and one-quarter (1 1/4) hour late, and did not appear for a rescheduled interview to complete the interview. Dr. Randall testified in this matter and was declared an expert in adult psychology and child psychology.
Ms. R admitted to Dr. Randall ingesting heroin, cocaine, marijuana, and non-prescribed Percocets. Dr. Randall points out that Ms. R has a serious, long-standing substance abuse problem but that she has no insight into the reasons for her substance abuse, minimizes her substance abuse problem and denies that it still exists. When Dr. Randall inquired about Keysha being born positive for cocaine, ". . . Ms. R admitted that she had been using cocaine, but said that it was `not much'" (Petitioner's Exhibit N at page 4). In fact, Ms. R continues to minimize the effect of her substance abuse upon Keysha despite her involvement in numerous substance abuse treatment programs as is evidenced in the following answers she gave while being cross-examined by the Assistant Attorney General:
Q. Is it not true that your child was also born testing positive for cocaine?
A. Yeah, she test positive. That's what they say.
Q. Okay, so it wasn't just that she was detoxing from methadone. She was also — she had also at birth tested positive for cocaine?
A. Yeah. But it wasn't that she had to have it. (Emphasis added)
(Testimony of Myrna R at page 98)
Dr. Randall concludes that Ms. R's ". . . does not appear at all committed to treatment and her prognosis for recovery at this time is very poor" (Petitioner's Exhibit N at page 6) "[c]ourts are entitled to give great "weight to professionals in parental termination cases." In reChristina V., 38 Conn. App. 214, at 221 (1995). In fact Ms. R herself agreed with this when she told Dr. Randall "I could be clean today and you don't know what might happen tomorrow." (Petitioner's Exhibit N at page 3)
In addition to her long-standing substance abuse problem Ms. R has other problems. With the exception of a two week job with Expect Discounts, Ms. R has since before the birth of Keysha not been employed nor shown any commitment to finding full-time employment. Other than her brief employment with Expect Discounts, Eric Hundley, Veronica Benjamin the D.C.F. social worker assigned to the case from August 21, 2000, to CT Page 2807 March 15, 2001, and Paulette Limato all testified that Ms. R had no independent source of income. In fact there was no testimony by any of the witnesses nor documentation in any of the exhibits as to the source of Ms. R's income.
Ms. R does not have her own apartment. She has been living with her elderly mother and, at times, other individuals, at her mothers apartment on Chamberlain Street in New Haven. Ms. R has never offered an alternative to living with her mother, nor told D.C.F. that she was going to move out of her mother's apartment and find a place of her own, despite being told by all the D.C.F. social workers assigned to the case that she needed to find her own housing. The D.C.F. workers assigned to this matter have made numerous attempts to assist Ms. R to obtain appropriate housing, including giving Ms. R information on how to contact the New Haven Housing Authority, referring her to the Connecticut Incorporated Supportive Housing for Recovering Families, and assisting her in obtaining Section Eight (8) Housing. Ms. R failed to follow through on these recommendations.
Ms. R was also referred to The Connecticut Mental Health Center Hispanic Clinic for parenting classes. She failed to follow through with this service attending only three (3) out of six (6) sessions.
Ms. R has been in a plethora of substance abuse programs from all of which, except for the Horizons Program, she was discharged for noncompliance stemming from disruptive behavior and/or leaving the program and/or dirty urines. She has failed to enter other programs, some offered after a finding that reasonable efforts to re-unify were no longer appropriate, to address her substance abuse problem. She was arrested in March 2000, in New Haven for Possession of Narcotics. She has failed to seek employment, find housing or attend parenting classes for all of which D.C.F. has provided assistance. She has failed to rehabilitate. In addition the prospect for rehabilitating are very poor. According to Dr. Randall, "Her prognosis for follow-through on the treatment and services that she would need to provide an adequate home for her daughter are poor. . . . It is not expected that she would be able to make sufficient recovery within a reasonable period of time that would enable her to resume care of her child." (Petitioner's Exhibit N at pages 8 and 9). Therefore, D.C.F. has proven by clear and convincing evidence the statutory ground alleged as to the respondent mother.
The statutory grounds alleged against the biological father of Keysha, John Doe, are failure to rehabilitate, abandonment and no on going parent-child relationship.
On of the grounds alleged by D.C.F. concerning John Doe is that he is CT Page 2808 the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding and has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child. This ground tracks the language contained in Conn. General Section 17a-112 (j)(3)(B).
In order to terminate the parental rights of John Doe on this ground, D.C.F. must initially show by clear and convincing evidence that it has made reasonable efforts to locate the him and to reunify the child with the him, unless the court finds in this proceeding that the he is unwilling or unable to benefit from these reunification efforts.
D.C.F. published a notice in the New Haven Register informing John Doe informing him that a T.P.R. petition had been filed. There has been no response by any man to the publication, nor has any other man been named as the putative father by Ms. R nor had any other man come forward claiming to be Keysha's father. Therefore, the court finds that D.C.F. has proven by clear and convincing evidence that it has made reasonable efforts to locate the father of Keysha.
Because John Doe, the biological father, has not come forward, nor has any other man come forward claiming to be Keysha's father, nor has any other man been named by Ms. R as Keysha's father D.C.F. could not provide services to rehabilitate this individual so that he could assume a position in Keysha's life. Therefore, the court finds this ground has been proven by clear and convincing evidence.
Because neither John Doe, nor any other man has come forward or has been named by Ms. R as Keysha's father the grounds of abandonment and no ongoing parent-child relationship have also been proven by clear and convincing evidence.
 DISPOSITION
In the dispositional phase of a termination case, the court must consider whether D.C.F. has proven by clear and convincing evidence that termination is in the best interest of the child.
Before making a decision whether or not to terminate the respondent mother's and/or respondent father's parental rights the court must consider and make findings on each of the seven criteria set forth in Conn. Gen. Stat. Sec. 17a-112.
These criteria and the court's findings, which have been established by CT Page 2809 clear and convincing evidence, are as follows:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parents. D.C.F. made considerable efforts to help Ms. R for approximately two and one-half (2 1/2) years with their her problems. They provided referrals to a multitude of agencies to address all of the Ms. R's issues and provided individual assistance to Ms. R Services were offered to address a myriad of neglect related issues: substance abuse, housing, employment and parenting. These services were not taken advantage of. Given the length of time that these services were in place, Ms. R's continued substance abuse and her denial/minimization of this problem, her lack of motivation and lack of success at finding stable housing and employment and her failure to take advantage of parenting classes it is unreasonable to conclude that she will be able to effectively parent Keysha within a reasonable amount of time.
The biological father has not been identified nor come forward to take advantage of any services to facilitate re-unification with Keysha.
(2) This court finds that D.C.F. made reasonable efforts to reunite Ms. R with Keysha pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, as amended. For the reasons set forth previously, the court finds that D.C.F. offered appropriate services and sufficient time for Ms. R to reunify with her child.
This court finds that D.C.F. was justifiably prevented from making reasonable efforts to reunite the biological father with Keysha pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, as amended because the biological father has not been identified nor come forward.
(3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order must also be addressed. Specific Steps were signed by Ms. R on July 9, 1999, and were approved by the Court (Cohn, J.) on that same date. (Petitioner's Exhibit H). Ms. R has failed to comply with the Specific Steps. There were no Specific Steps ordered for Keysha's biological father as the biological father has not been identified nor come forward.
(4) The feelings and emotional ties of the child with respect to the child's parents, any guardian of the child, and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant ties must be CT Page 2810 addressed. Keysha has had at times consistent, and at times inconsistent, visitation "with her mother. According to Dr. Randall Ms. R is not the psychological parent of Keysha. A psychological parent is the person(s) to whom Keysha, or any child, would look to for love, security, stability, and nurturing — the person a child can count on when something goes wrong. Keysha "shows very little signs of attachment with her mother . . . there does not appear to be a close relationship between the two of them." (Petitioner's Exhibit N at page 6 and page 7). Paulette Liamto echoed this conclusion "But I just — I didn't see the bond there that mom really wanted there to be. And it's just because she I don't think that she recognized her as her mother (Testimony of Paulette Limato at page 51). A telling example of this is that, although Ms. R his appropriate when she visits Keysha, Ms. R cries during a substantial portion of the visit. According to Tomi Handy, the current D.C.F. social worker assigned to the case, Keysha will go back to her foster mother and tell her "Mommy, I made the woman (emphasis added) cry" (Testimony of Tomi Handy at pg. 70).
Keysha has no feelings or emotional ties to her biological father because she has had no contact with him. Keysha has been placed in a legal risk placement since April 6, 2001. As such her foster parents have exercised physical care, custody or control of the child for less than one year. However, in this time there has developed a strong bond between Keysha and her foster parents. Previous to this Keysha was placed in four (4) foster homes.
(5) Keysha just turned three.
(6) The efforts the parent has made to adjust her or his circumstances, conduct or conditions to make it in the best interest of the child to return to such home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. Ms. R has denied/minimized her substance abuse problem, has not followed through with housing, employment, or parenting classes. She has failed to take advantage of the numerous services offered to her so that she can parent Keysha.
The biological father has not been identified nor come forward to adjust his circumstances so that Keysha could be returned home in the foreseeable future.
Ms. R has had, at best, an inconsistent pattern of visitation with CT Page 2811 Keysha. At times she visited Keysha regularly, at times sporadically.
The biological father has come forward to either visit or communicate with Keysha.
(7) The final consideration is the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any person or by the economic circumstances of the parent. This court is unaware of any unreasonable act or conduct by anyone or any agency or of any economic circumstance that prevented either Ms. R, the or the biological father from having a meaningful relationship with Keysha.
 BEST INTEREST OF THE CHILD
The court has determined that the ground for termination of parental rights of the respondent mother and the respondent biological father have been proven by clear and convincing evidence. The court has also determined that the seven (7) statutory criteria which all weigh in favor of termination being in Keysha's best interest, have been established by clear and convincing evidence.
Keysha is a child with many special needs. Keysha was born testing positive for Hepatitis C, and cocaine and addicted to heroin and methadone. She was hospitalized for thirty-six (36) days after her birth because of these conditions. Dr. Randall saw Keysha when she was approximately two (2) years and three (3) months of age. At that time Keysha was, according to Dr. Randall, developmentally delayed "across the board" Dr. Randall attributed this delay to a number of factors, including being moved around between foster placements in a short period of time and the fact that she was born with cocaine, heroin and methadone in her body. Since being placed in the legal risk foster home Keysha is doing much better. Paulette Limato testified that since being placed in this home the foster parents have done "a wonderful job" with Keysha. When she first came to this family she was anxious, needy, had developmental delays, and was not speaking. She has adjusted well to this family. She is happy and comfortable. She calls her foster parents mommy and poppy. The foster parents were so concerned with the trauma that some of the visits that Keysha had with her mother were causing Keysha, that one of them would take Thursdays off from work to drive Keysha half-way to her visit with Ms. R so that Keysha would be less traumatized. Ms. R's concerns were with her criminal difficulties — she failed to see her daughter on one of these visits because she was working in an undercover" capacity with the New Haven Police Department. According to Ms. Limato, Keysha has progressed to the point where the services of CT Page 2812 Birth to Three are no longer needed. This family has agreed to adopt Keysha if her mother's and father's parental rights were terminated.
Ms. R has had a myriad of services made available to her. Yet, despite this, she has not taken advantage of them, nor will she in the future take advantage of them. She is not capable of parenting Keysha, nor can she become capable of parenting her in the future.
The biological father has come forward to parent Keysha.
Dr. Randall testified that:
[Keysha] has been out of her mother's home for a significant period of time. She needs to have some stability in her life. Kids need to have that sense of security to be able to have a psychological parent and learn how to able to trust people in their lives and count on people, and she is getting to an age where she really needs to finally have that permanency that she will be able to grow up trusting in the stability of her home. (Testimony of Dr. Randall at page 185)
Based on the foregoing findings, the court determines, by clear and convincing evidence, that it is in the best interest of Keysha that a termination of parental rights be entered with respect to the mother, Myrna R and the unknown biological father, John Doe. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of D.C.F. is appointed statutory parent for Keysha. The Commissioner shall file with this court no later that thirty days following the judgement a written report of efforts to effect a permanent placement for Keysha and file further reports as are required by state and federal law.
Gerard F. Esposito Judge of the Superior court